IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NOAH J. GLEASON,

                  Petitioner,

vs.                               Case No. 11-3110-SAC

DAVID R. MCKUNE, et al.,

                  Respondents.

## MEMORANDUM AND ORDER

This matter comes before the court on a petition for habeas corpus filed pursuant to 28 U.S.C. § 2254.

## I. Background

A jury convicted Petitioner Gleason of one count of first-degree felony murder in 2002. His attorney then filed a motion for new trial and judgment of acquittal. Gleason added a *pro se* amendment which, among other things, alleged that he had received ineffective assistance of counsel based upon deficient performance, and that his attorney had a conflict of interest. Gleason also filed a *pro se* K.S.A. 60-1507 motion in September 2002, again alleging ineffective assistance of counsel. The district court appointed a different attorney to represent Gleason on the *pro se* motions. Finally, Gleason filed a *pro se* motion for a durational departure from his sentence because of the disparity between his sentence and the sentences of his co-

defendants, Cady and Bennett. The district court considered and denied all motions after an evidentiary hearing in September 2002. Gleason's original counsel represented Gleason at the sentencing hearing, at which the court sentenced Gleason to life imprisonment with no possibility of parole for 20 years.

Represented by different counsel, Gleason appealed his conviction, but the Kansas Supreme Court affirmed it. *State v. Gleason*, 277 Kan. 624 (2004). In 2004, Petitioner filed a second *pro se* motion for post-conviction relief pursuant to K.S.A. 60-1507, which the State moved to dismiss as successive. The district court dismissed Gleason's claims of prosecutorial misconduct and ineffective assistance of counsel, but permitted Gleason's claims regarding withholding of evidence to proceed. In July 2005, the district court permitted Gleason to amend his K.S.A. 60-1507 motion to allege his trial counsel was ineffective by failing to object to Gleason's statements which had allegedly been elicited by a *Miranda* violation. *See Miranda v. Arizona,* 384 U.S. 436 (1966). After an evidentiary hearing, the court denied Gleason's *Miranda* claim, finding that it should have been raised in the direct appeal along with his other allegations of ineffective assistance of counsel. The court also reached the merits of that claim but found no deficient performance of counsel and no prejudice to Gleason by counsel's actions. Gleason unsuccessfully appealed that denial, *Gleason v. State*, 163 P.3d 1272, 2007 WL 2301919 (Kan. Ct. App., Aug. 10, 2007) (Case No.

2

96,004) (Unpublished Opinion), and the Kansas Supreme Court denied review.

In 2007, Gleason filed another motion for post-conviction relief, which the district court denied. Gleason did not appeal that ruling, but filed a motion for relief from the judgment pursuant to K.S.A. 60-260(b)(6), raising claims of newly-discovered evidence and ineffective assistance of counsel. Gleason claimed that the terms of his co-defendants' plea agreements were newly-discovered evidence, and that the State had failed to tell the jury that in return for co-defendant Cady's testimony at Gleason's trial Cady had agreed to plead guilty to second-degree murder. Gleason also alleged that co-defendant Bennett had recanted her testimony.

The district court dismissed the 60-260(b)(6) motion, and the Kansas Court of Appeals affirmed that decision. *Gleason v. State*, 239 P.3d 114, 2010 WL 3853191 (Sept. 24, 2010) (Case No. 102,672) (Unpublished Opinion). The Kansas Supreme Court then denied review. Thereafter, Gleason filed this petition for federal habeas corpus relief.

## II. Factual History

The facts of the case, as determined by the Kansas Supreme Court in Petitioner's direct appeal, follow:

> Clarence Rinke was found dead of a gunshot wound on the kitchen floor of his home in rural Jefferson County on October 14, 1999. Approximately 2–1/2 years later, on April 2, 2002, Charolette Bennett, Collin Cady, and the defendant, Noah Gleason, were arrested in connection with Rinke's death.

Cady and Bennett agreed to testify against Gleason as part of a plea agreement. Their testimony, in which they corroborated each other, established the following.

Gleason had purchased marijuana from Rinke and had been in his house; it was Gleason's plan to burglarize Rinke's home to steal money and marijuana. Gleason told Cady that there would be approximately $70,000 at Rinke's house and that he wanted Rinke present to open the safe. Gleason and Cady checked out the Rinke area about a week and a half prior to the actual burglary. Gleason purchased coveralls at Bailey's in Lawrence. He also purchased gloves and masks to conceal their identities; tennis shoes to throw away after the crime; and tote bags to carry the marijuana, money, and their guns. They had two weapons, a .38 revolver and a shotgun, later sawn off, that Gleason purchased at Jayhawk Pawn and Jewelry in Lawrence. They had cell phones, two shotgun shells loaded with bird shot, and two walkie-talkies.

Gleason and Cady decided to have Bennett, who was sexually involved with Cady, serve as their driver and drop them off at the gate of Rinke's house. Bennett was to then lure Rinke out of his house by pushing the button on the gate intercom and telling Rinke that her car was stuck. She was to receive $1,000 for her help.

Cady called Gleason the morning of October 14, 1999, who told him to contact Bennett and meet at Johnny's Tavern in Lawrence at 7 p.m. Bennett and Cady went to Johnny's around 7 p.m., and Gleason arrived as Bennett and Cady were smoking marijuana in Cady's car. The three of them entered the bar, drank a shot of alcohol, and left. They then went to Gleason's property to put on the coveralls and get the weapons. From there they drove to Gleason's former house on 13th Street, near Rinke's, to show Bennett where to later park the car and wait for them. They left around 7 or 7:30 p.m., and she then drove them in Gleason's mother's car to Rinke's property.

Cady, who had been carrying one of Gleason's cell phones, and Gleason then left the car and hid in the woods next to Rinke's driveway. Though Gleason had been recuperating from a serious accident, according to Cady he was in good physical condition at the time. Bennett was given Gleason's other cell phone and eventually received Cady's call telling her to hit the button on the intercom. She then told Rinke over his intercom that she met a guy at a bar who gave her directions to a house which she could not find but her car had gotten stuck. When Rinke offered to pull her out with his tractor, Bennett called Gleason and Cady on the cell phone to inform them that Rinke was on his way to help her.

Rinke came out on his four-wheeler to his barn, and from there drove his tractor to the gate to help Bennett. Before Rinke arrived,

Bennett left and drove to Gleason's former property on 13th Street where she smoked marijuana while she waited for Cady to call her to pick them up at Rinke's.

At that point Gleason and Cady entered Rinke's house and began looking for cash or drugs. They heard the tractor coming back, and Gleason mentioned backing out of the plan. Gleason then exited the house to watch for Rinke, and Cady remained in the mud room. Rinke saw Cady and bolted at him, so Cady "bonked" him on the head with the sawed-off shotgun. Rinke grabbed for the shotgun, and it discharged, hitting Rinke.

Cady got scared and took off running. After he left, Rinke, though seriously wounded, called 911.

Cady ran to a heavily wooded area, ejected the spent shell from the shotgun, loaded a live round, and continued running. He heard police sirens and took off his coveralls, wadding them up in the duffel bag and burying them under some leaves and a tree. He continued running and then buried the shotgun in the woods. He then called Bennett on the cell phone and told her to stay put and wait for them.

Gleason arrived at their designated meeting place, Gleason's old house on 13th Street. He told Bennett that Cady had accidentally shot Rinke and that he and Cady had gotten separated. Cady arrived 15 to 20 minutes later very distraught and without the coveralls, the bag, or the shotgun. Gleason yelled at him because he had left behind evidence. Gleason told Bennett if she breathed a word of anything that happened, he would personally kill her.

They stashed their shoes, Gleason's .38 revolver, and Gleason's coveralls on the property. Gleason then drove all of them to Johnny's Tavern, where they stayed until closing time. The next day, they retrieved the evidence and burned it in a trash barrel. On two later occasions, Gleason dropped off Cady to look for the shotgun. Bennett and Cady considered Gleason the ringleader of the plan.

Cady's and Bennett's testimony was fleshed out at the trial by other witnesses and exhibits.

Law enforcement was notified of Rinke's 911 call at 9:41 p.m. and arrived at 10:23 p.m. Based on bloodstain evidence, they determined that Rinke had suffered a blow to the head and bled profusely in the mud room before collapsing in the kitchen. They found brown jersey gloves in the mud room, approximately 75 pounds of marijuana in a freezer, and just over $570,000 in cash elsewhere in the house.

Four days later, on October 18, 1999, the KBI interviewed Gleason. Gleason stated that the last time he had been to Rinke's house was August 1998, but that they had talked on the phone on October 14, 1999, regarding a small cooler that Gleason had

borrowed. Gleason claimed he was at Johnny's Tavern from 8:30 p.m. until 12:30 or 1 a.m. the night of October 14.

On or about February 3, 2000, after a discovery by Rinke's neighbor, law enforcement found, in the woods near Rinke's home, coveralls that contained an expended shotgun shell and a pair of brown gloves. The coveralls were wrapped around two bags. The manufacturer of the coveralls verified that similar coveralls were sold at Bailey's in Lawrence.

Approximately 2 years later, on April 2, 2002, the KBI again interviewed Gleason. He denied having any involvement in Rinke's murder, but admitted that he had been to Rinke's house. Gleason admitted buying a weapon, but claimed it had been stolen. He also admitted that he and an individual named Denny Cooper had previously discussed the possibility of robbing Rinke at his home.

The next day, April 3, based upon information from Cady, law enforcement searched a wooded area south of Rinke's home where they located a single-shot, 12–gauge, sawed-off shotgun containing a live round. The shotgun serial number confirmed it was the one Gleason had purchased approximately 2 months before the murder. A recovered shell further demonstrated by its markings that Gleason's shotgun was the murder weapon.

That same day, after Gleason was arrested and jailed, James Collins, Bennett's common-law husband, received a collect call from him. Gleason asked if Bennett had said anything, and when Collins replied that she had not, Gleason said: "You just tell her to keep her fucking mouth shut." Phone records confirmed that for the jail phone available to prisoners, one call was made to James Collins on that day.

Gleason's phone records confirmed that at 9:23 a.m. on the day of the murder, a phone call was made to his residence from the cell phone he had given to Cady. Phone records also revealed that at 4:47 p.m., a call was made from Gleason's cell phone to Rinke's residence. At 6:18 and 6:40 p.m., calls were made to Gleason's residence from the cell phone he had given to Cady. At 8:35, 9:09, 9:14, 9:17, and 9:46 p.m., calls were made from the cell phone Gleason had given to Cady to the cell phone Gleason had given to Bennett.

There were no calls from either Rinke's home phone or cell phone to any of Gleason's phones on October 14. However, Sheryl Gleason, Noah Gleason's ex-wife, testified Rinke called her between 8 and 9 p.m. that day. Rinke told her he had received a strange call from Gleason earlier that day and that Gleason wanted to come by and return a cheap cooler that he had kept for over a year.

A witness named Denny Cooper testified he and Gleason used to work together and smoke marijuana together. Gleason called Rinke, his marijuana dealer, "the old man." During the winter of 1997,

6

Gleason had spoken to Cooper about trying to rob the old man of whatever they could get out of the house. Gleason speculated that there was a small safe in the basement containing up to 200 pounds of marijuana, as well as cash. Cooper did not take Gleason seriously.

By contrast, Gleason's defense contended (1) he had been at Johnny's Tavern that night and (2) he was physically unable to have participated in the events due to injury. However, Stephen Pearson spoke with Gleason after midnight the evening of the murder at Johnny's and testified Gleason was walking normally.

Kevin Horch saw Gleason at Johnny's Tavern on October 14 with a dark-haired woman, later identified as Dianne Cox, now Dianne Gleason. According to him, Gleason and the woman came in around 7:30 p.m. and were there around 2 a.m., when the bar closed. He also saw Cady at Johnny's that night.

Dianne Gleason, Gleason's current wife, testified that they saw each other on October 14 at Johnny's around 7:30 to 8 p.m. She stayed about an hour and a half. Gleason told Dianne that a friend of his had borrowed his car. She did not see Cady or Bennett at Johnny's.

In addition to Pearson, several witnesses testified concerning Gleason's physical condition. His mother testified that Gleason had a serious motorcycle accident in May 1999; he was able to walk, but had a crooked gait. Stephen Munns, an orthopedic surgeon, treated Gleason for broken bones in both of his arms, a broken back, and a crushed pelvis. He last saw Gleason professionally the day before the murder. Munns found that Gleason was continuing to improve, and he anticipated releasing Gleason to return to work after Gleason's appointment in November. An SRS worker who provided Gleason cash, medical services, and food stamps because of his injuries testified he was in pretty bad shape, but hobbled to her office in July 1999.

After the jury convicted Gleason of felony murder on August 2, 2002, his attorney, John Kurth, filed a motion for new trial and judgment of acquittal. Gleason added a pro se amendment which, among other things, alleged Kurth's conflict of interest and his ineffective assistance of counsel based upon deficient performance.

Kurth filed a response, to which Gleason filed a pro se rebuttal. Gleason also filed two pro se motions for new counsel and requested a continuance of the September 5, 2002, sentencing hearing to allow new counsel time to prepare. He also filed a K.S.A. 60–1507 motion, again alleging ineffective assistance of counsel. On August 20, the court appointed legal counsel Micheal Ireland to represent Gleason on his pro se motions. Gleason then filed a pro se motion on September 4 for a durational departure from his sentence because of the disparity in sentences among himself, Cady, and Bennett.

>    All motions were considered and denied by the district court at a
> hearing on September 5, 2002. The court then sentenced Gleason to
> life imprisonment, with no possibility of parole for 20 years. That same
> day, Kurth filed a notice of appeal to this court. On September 6,
> Gleason filed a pro se "Petition to reopen Investigation." On
> September 12, he also filed a pro se "Petition for Direct Appeal" asking
> the district court to notify him when Kurth filed his notice of appeal.
> On September 19, the district court appointed the appellate defender's
> office as Gleason's appellate counsel.

*State v. Gleason*, 277 Kan. 624, 626-631 (2004). Absent clear and

convincing evidence to the contrary, this court must presume that these

factual findings are correct. 28 U.S.C. § 2254(e)(1); *Saiz v. Ortiz*, 392 F.3d

1166, 1175 (10th Cir. 2004).

## III. AEDPA Standard

This matter is governed by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"). AEDPA imposes a "highly deferential

standard for evaluating state-court rulings, and demands that state-court

decisions be given the benefit of the doubt." *Renico v. Lett,* 559 U.S. __, 130

S.Ct. 1855, 1862 (2010) (citation and internal quotation marks omitted).

Under AEDPA, where a state prisoner presents a claim in habeas corpus and

the merits were addressed in the state courts, a federal court may grant

relief only if it determines that the state court proceedings resulted in a

decision (1) "that was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of

the United States" or (2) "that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding."
28 U.S.C. § 2254(d).

A state court decision is "contrary to clearly established Federal law"
when: (a) the state court " 'applies a rule that contradicts the governing law
set forth in [Supreme Court] cases' "; or (b) " 'the state court confronts a
set of facts that are materially indistinguishable from a decision of [the
Supreme] Court and nevertheless arrives at a result different from [that]
precedent .' " *Maynard v. Boone,* 468 F.3d 665, 669 (10th Cir. 2006)
(quoting *Williams v. Taylor,* 529 U.S. 362, 405 (2000)).

A state court decision involves an unreasonable application of clearly
established federal law where it identifies the correct legal rule from
Supreme Court case law, but unreasonably applies that rule to the facts. *Id.*
at 407–08. Likewise, a state court unreasonably applies federal law, as
determined by the Supreme Court, where it either unreasonably extends, or
refuses to extend, a legal principle from Supreme Court precedent where it
should apply. *House v. Hatch,* 527 F.3d 1010, 1018 (10th Cir. 2008).

In order to obtain relief, a petitioner must show that the state court
decision is "objectively unreasonable." *Williams v. Taylor,* 529 U.S. 362, 409
(2000) (O'Connor, J., concurring). "The question under AEDPA is not
whether a federal court believes the state court's determination was
incorrect but whether that determination was unreasonable—a substantially
higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). "[A]

decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard v. Boone,* 468 F.3d 665, 671 (10th Cir. 2006).

## IV. Discussion

### A. Presumption of Intent Instruction

Petitioner alleges that the trial court erred by giving a presumption of intent instruction, which was inconsistent with its giving of the presumption of innocence instruction Dk. 1, p. 13. The intent instruction (Instruction 3) stated, among other matters, that an inference exists that a person intends all the usual consequences of his voluntary acts. The innocence instruction (Instruction 4) stated, among other matters, that a presumption exists that the defendant is not guilty until the jury is convinced of his guilt beyond a reasonable doubt, from the evidence. Petitioner first raised this claim in his motion for relief judgment under K.S.A. § 60-260(b). When the district court denied that motion Petitioner appealed, but did not raise this issue.

Petitioner bears the burden to show he has exhausted available state remedies. *Hernandez v. Starbuck,* 69 F.3d 1089, 1092 (10th Cir. 1995). A claim must be presented as a federal constitutional claim in the state court proceedings in order to be exhausted. *See Duncan v. Henry,* 513 U.S. 364, 365–66 (1995) (per curiam). The exhaustion requirement is satisfied once the federal claim has been presented fairly to the state courts. *See Castille*

*v. Peoples,* 489 U.S. 346, 351 (1989). But "[f]air presentation requires that the federal issue be presented properly "to the highest state court, either by direct review of the conviction or in a postconviction attack." *Dever,* 36 F.3d at 1534. Because Petitioner failed to raise this claim in his appellate brief or in his petition for review, it has not been presented to the Kansas Supreme Court and is thus procedurally defaulted from this court's review. *See Coleman v. Thompson*, 501 U.S. 722, 732, 735 (1991).

## Overcoming Procedural Default

Petitioner can overcome procedural default only by demonstrating "cause and prejudice or a fundamental miscarriage of justice." Smith v. Workman, 550 F.3d 1258, 1274 (10th Cir. 2008). *Id.* For a petitioner to show cause he must demonstrate that "some objective factor external to the defense impeded [his] efforts to comply" with the state law. *Murray v. Carrier,* 477 U.S. 478, 488 (1986). And for a petitioner to show prejudice, he must show that he suffered "actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). The fundamental miscarriage of justice exception, meanwhile, is "a narrow exception to the cause requirement where a constitutional violation has probably resulted in the conviction of one who is actually innocent of the substantive offense." *Dretke v. Haley,* 541 U.S. 386, 393 (2004) (internal quotation marks omitted).

Petitioner contends that his procedural default was caused by the following external factors: the State's withholding of evidence from the inquisitions; the Prosecutor's failure to disclose the terms of his co-defendants' plea agreements; the trial court's appointing one counsel to represent Petitioner for resolution of his pro se motions and another to represent Petitioner immediately thereafter for sentencing; and the trial court's finding claims in his 60-1507 motion to be procedurally defaulted after the trial court had invited Petitioner to file a 60-1507 motion. But even assuming *arguendo* that these constitute cause, Petitioner still bears the burden to show actual prejudice. *See U.S. v. Cronic*, 466 U.S. 648, 662 n. 31 (1984) (rejecting government's suggestion that a presumption of prejudice arises when counsel is subject to external constraints on his performance.) This is a burden Petitioner cannot meet because the evidence of his guilt was overwhelming. *See* 277 Kan. at 641-42.

### B. Aiding and Abetting Instruction

Petitioner next contends that he was denied a fair trial by the Court's legally inadequate instruction on aiding and abetting felony murder, which he asserts relieved the State of its burden to prove that the death occurred during the commission of a burglary.

Contrary to Petitioner's claim, the felony murder instruction given by the trial court required the jury to find that Cady killed Clarence Rinke at a

certain time and place, and "that such killing was done while in the commission of a burglary in which defendant was a participant." Petitioner contends that the killing was done in the commission of an aggravated burglary, an intervening felony in which he was not a participant, despite his previous participation in the burglary.

The Kansas Supreme Court addressed this issue and held: "A defendant may be convicted of felony murder if he or she aids and abets the underlying felony, and the defendant need not even be physically present when the crime is committed. *Gleason*, 277 Kan. at 635." *State v. Edgar,* 281 Kan. 47, 61 (2006). Petitioner's disagreement with this holding is an objection to the state court's interpretation of state law, which provides no basis for federal habeas corpus relief. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

Petitioner also contends that the instructional error rendered the trial fundamentally unfair because the aiding and abetting instruction "so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quotation marks omitted). This claim would provide a basis for habeas relied, but since there was no instructional error, no resulting unfairness to Petitioner has been shown.

Further, the record fails to show that Petitioner presented this federal due process argument to the Kansas appellate Courts. The only federal constitutional claim he raised in conjunction with his aiding and abetting

argument was an Eighth Amendment claim. *See Gleason*, 277 Kan. at 638.

As a result, this claim is unexhausted and, ultimately, procedurally barred,

since it is too late for Petitioner to file an application for state post-conviction

relief raising the claim. *See Anderson v. Sirmons*, 476 F.3d 1131, 1139 n. 7

(10th Cir. 2007) ("Anticipatory procedural bar occurs when the federal

courts apply procedural bar to an unexhausted claim that would be

procedurally barred under state law if the petitioner returned to state court

to exhaust it.") (internal quotation marks omitted).

### C. Use of "Multiple and Inconsistent Theories"

Petitioner next raises a related issue - that he was denied due process

at trial and in sentencing because the State prosecuted him for first degree

murder, but allowed co-defendant Cady to plea to second degree murder,

and co-defendant Bennett to plea to aggravated burglary, despite all parties'

participation in the same crime. The Kansas Supreme Court found that

because Petitioner's co-defendants pleaded to lesser charges, there was no

rational basis for Petitioner to compare their lesser sentences to his.

*Gleason*, 277 Kan. at 656.

> By contrast, Gleason was convicted by a jury of first-degree felony
> murder—an off-grid felony punishable by life in prison—while,
> according to the parties' briefs, Cady pled guilty to second-degree
> murder and Bennett pled guilty to conspiracy to commit armed
> robbery, both of which are less serious and grid offenses. Accordingly,
> there is no requirement that the district court give reasons for
> pronouncing different sentences for different crimes.

Gleason, 277 Kan. at 655.

### 1. Disparate Length of Sentences

The Court has found no United State Supreme Court case requiring a co-defendant who enters a plea to be sentenced identically or substantially similarly to a participant in the same crime who does not plea. Instead, well-established federal law upholds the use of plea agreements and finds it constitutional to extend leniency in exchange for a plea of guilty, but not to extend leniency to those who have not demonstrated those attributes on which leniency is based. *Corbitt v. New Jersey*, 439 U.S. 212 (1978).

The Kansas Supreme Court found Petitioner's longer sentence to be justified based on the following acts taken by Petitioner: he chose to go to trial; he was the primary person who planned the crime; he managed or directed the crime; he had the contact with the victim; he was familiar with the victim's home; and he was the person who knew there would likely be money and possibly drugs in the victim's house they could obtain. 277 Kan. at 656. The Court's determination was reasonable.

### 2. Inducement of Perjury

Part of Petitioner's concern appears to be that the existence of the plea agreements may have induced his co-defendants to commit perjury. The plea agreements between Petitioner's codefendants and the government are not a part of the record before this court, but trial testimony does not indicate that either agreement was contingent on specific results. Such agreements, which typically require the defendant to testify truthfully and

condition one's sentence reduction on the value or benefit of his cooperation, are not impermissible inducements to lie. *See Saavedra v. Thomas,* 132 F.3d 43 (Table) (1997), citing *United States v. Dailey,* 759 F.2d 192, 196-201 (1st Cir. 1985). Petitioner offers no evidence that either plea agreement was improperly contingent.

### 3. Lack of Instruction to Jury

Apparently concerned about the risk of perjury, Petitioner additionally argues that the court should have instructed the jury concerning the nature of the plea agreements. But "[a]ny requirement that a trial court specifically instruct a jury to weigh an accomplice's testimony with care is not a constitutional requirement and is not sufficient to entitle a petitioner to relief under § 2254. *Scrivner v. Tansy,* 68 F.3d 1234, 1239 (10th Cir.1995), *cert. denied,* 116 S.Ct. 1277 (1996)." *Saavedra*, 132 F.3d at *2. This Court's role in evaluating jury instructions is limited – it looks only to determine if instructional errors "had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in a constitutional sense." *Shafer v. Stratton,* 906 F.2d 506, 508 (10th Cir. 1990) (quotation omitted). Under clearly established federal law, where the informant/codefendant is subject to rigorous cross-examination and the trial court gives a general credibility instruction, due process is met. *Id. See Hoffa v. United States,* 385 U.S. 293, 311 (1966).

Those two safeguards are present in this case. Both Cady and Bennett

were subjected to rigorous cross-examination during Petitioner's trial. *See* Trans. Vol. I, p. 159-193 (Cady's cross examination), 195 (re-cross); and 212-235 (Bennett's cross examination), 236-37 (re-cross). And the trial court gave the jury two relevant instructions: a general credibility instruction, telling the jury to use their common knowledge and experience to determine the weight and credit to be given the testimony of each witness; and an accomplice instruction, stating that the jury "should consider with caution the testimony of an accomplice," and defining an accomplice as a witness who testified that he was involved in the commission of the crime with which the defendant is charged. Ap. Ct. Rec. Vol. IV, Instructions 5 & 6. Therefore, no basis for habeas relief has been shown relating to the co-defendants' plea agreements.

### D. Insufficient Evidentiary Hearings

Petitioner contends that the Court admitted detrimental confession evidence at trial without investigating its accuracy or legality at a pretrial hearing. To the extent this issue relates to counsel's failure to file a motion to suppress Petitioner's statements allegedly made in violation of *Miranda*, it shall be addressed later, in examining Petitioner's ineffective assistance of counsel claims.

Petitioner additionally contends that the district court found trial counsel to be effective without fully investigating that issue at post-trial

hearings. Petitioner adds that the court "failed to call a codefendant to testify at post-trial hearing for changing trial testimony." Dk. 1, p.16. These claims are not properly brought in this petition. The Tenth Circuit has emphasized that due process challenges to post-conviction procedures fail to state constitutional claims cognizable in a federal habeas proceeding. *See Phillips v. Ferguson,* 182 F.3d 769, 772-73 (10th Cir.1999) (holding that challenges to the constitutionality of state post-conviction procedures are not cognizable as independent claims in federal habeas corpus actions); *Sellers v. Ward,* 135 F.3d 1333, 1339 (10th Cir.1998) ("[B]ecause the constitutional error [the defendant] raises focuses only on the State's post-conviction remedy and not the judgment which provides the basis for his incarceration, it states no cognizable federal habeas claim.") *United States v. Dago*, 441 F.3d 1238, 1248 (10th Cir. 2006).

### E. Prosecutor's Violation of Motion in Limine

The Kansas Supreme Court found that the Prosecutor violated the Court's in limine order by introducing evidence at trial of Petitioner's prior burglaries. 277 Kan. at 641. Petitioner contends this prosecutorial misconduct violates his Sixth and Fourteenth Amendment rights.

In examining this issue, the Kansas Supreme Court applied the following test:

> In order for prosecutorial misconduct to constitute reversible error, the error must be of such magnitude as to deny a defendant his constitutional right to a fair trial. *State v. Pabst,* 268 Kan. 501, 504, 996 P.2d 321 (2000). Three factors should be considered in

> determining whether to grant a new trial because of a prosecutor's
> violation of an order in limine. First, was the prosecutor's misconduct
> so gross and flagrant as to prejudice the jury against the defendant?
> Second, does the admission of the statement indicate ill will by the
> prosecutor? Third, is the evidence against the defendant so
> overwhelming that there was little or no likelihood the prosecutor's
> violation of the order in limine changed the result of the trial?
> (Citations omitted.)

*Gleason*, 277 Kan. at 641. The Supreme Court found that the prosecutor's

misconduct was flagrant and evidenced ill will, but did not prejudice

Petitioner because other evidence of his guilt was direct and overwhelming.

277 Kan. at 641-42 (finding "the evidence of Gleason's guilt was so

overwhelming there was no likelihood the violation of the order in limine

changed the trial result.").

The test applied by the Kansas Supreme Court is consistent with

clearly-established federal law, which is that prosecutorial misconduct

warrants reversal only if it is so egregious that it renders the entire trial

unfair. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 642-48 (1974);

*Cummings v. Evans,* 161 F.3d 610, 618 (10th Cir. 1998). Prosecutorial

misconduct does not, per se, violate a petitioner's constitutional rights.

*Darden v. Wainwright,* 477 U.S. 168, 181 (1986). The due process analysis

in these claims focuses on "the fairness of the trial, not the culpability of the

prosecutor," *Smith v. Phillips*, 455 U.S. 209, 219 (1982), and relief is limited

to cases in which the petitioner establishes that the misconduct resulted in

actual prejudice. *See Darden*, 477 U.S. at 181-83. In determining whether

the misconduct influenced the jury's verdict, the court considers "the trial as

a whole, including 'the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case.' " *United States v. Ivy,* 83 F.3d 1266, 1288 (10th Cir. 1996) (quoting *United States v. Martinez-Nava,* 838 F.2d 411, 416 (10th Cir. 1988)).

Petitioner's trial lasted several days, and the mention of his prior crimes was limited to one exchange between witness Rogers and the prosecutor. In response to the Prosecutor's questions, Rogers testified that he and defendant "would scope out places" and broke into different places to get things that defendant felt he needed. *See* Trans. Vol. I, p. 115-17. Defense counsel immediately objected and the trial court sustained the objection, struck the offending testimony noted above, and instructed the jury to disregard it. *Id.* The Prosecutor then asked what defendant's attitude was when those events occurred, and Rogers responded, "If you set the stage properly, that you had a 95% chance of getting away free." *Id.*, p. 117. When Defense counsel objected again, the Court sustained the objection and the Prosecutor moved on.

Petitioner asserts that it is "unmitigated fiction" to assume that prejudicial effects of such testimony can be overcome by instructions to the jury. *See Krulewitch v. United States*, 336 U.S. 440, 453 (1946) (Jackson, J., concurring). But "[a] jury is presumed to follow its instructions." *Weeks v. Angelone,* 528 U.S. 225, 234 (2000). Given the weight, extent and nature of the other testimony against the Petitioner, the Court finds that the Kansas

Supreme Court's determination that Petitioner failed to show prejudice from the admission of this improper testimony was a reasonable determination of the facts and the law.

### F. Prosecution's Solicitation of False Evidence

Petitioner next contends that the Prosecution knowingly solicited false testimony from Officer Delaney that Petitioner admitted to him that he had planned to rob Rinke. The Kansas Court of Appeals declined to review this claim and other claims of prosecutorial misconduct because Petitioner failed to bring this claim earlier, and failed to establish exceptional circumstances for initially raising it in a successive 60-1507 motion. 2007 WL 2301919, at *3.

Well-established federal law holds that a federal court may not review a state court claim if the state court's decision rests on a state law ground that is independent of the federal question and adequate to support it. *Coleman,* 501 U.S. at 729-30. "This rule applies whether the state law ground is substantive or procedural." *Id.* at 729. A state rule "is independent if it relies on state law rather than federal law and is adequate if it is regularly followed and applied evenhandedly." *Zimmer v. McKune*, 87 F.Supp.2d 1153, 1158 (D.Kan. 2000) (citing *Hickman v. Spears*, 160 F.3d 1269, 1271 (10th Cir. 1998)).

The successive motion rule is firmly established and is regularly followed in Kansas courts. *See e.g.* K.S.A. 60-1507(c); Kansas Supreme

Court Rule 183(d); *Holt v. State*, 290 Kan. 491, 496-97 (2010). This is an independent and adequate state procedural ground which bars this Court's reconsideration of this claim.

### G. State's Failure to Disclose Plea Agreement Terms

Petitioner contends that the State improperly negotiated a plea agreement with co-defendant Cady for second degree murder, which was not disclosed to the jury and prevented a fair trial. Dk. 1, p. 12. Petitioner cites no federal law requiring the State to disclose plea agreements to the jury. Instead, any duty runs only to the defense. *See California v. Trombetta*, 467 U.S. 479, 485 (1984).

But Petitioner may also contend that the State violated his right to a fair trial and committed a *Brady* violation by not disclosing the terms of the plea agreement to the defense. *See* Dk. 24, p. 13. Petitioner presented this issue to the Kansas Court of Appeals as newly-discovered evidence which provided the exceptional circumstances necessary to permit his filing of a successive 60-1507 motion. The Court of Appeals found that because testimony about Cady's plea agreement was presented at trial, the existence of the plea agreement was not newly-discovered evidence, and Petitioner could have discovered the exact terms of the plea by exercising due diligence. Petitioner suggests that the State intentionally kept the terms of the plea agreement unwritten until after his trial concluded, so it could not be discovered during trial.

### 1. Procedural Bar

Here as above, the decision by the Kansas Court of Appeals is an independent and adequate state procedural ground which bars this Court from reconsidering this claim. The Kansas Court of Appeals stated that Petitioner was not entitled to relief on this issue because Petitioner, in the exercise of due diligence, could have timely discovered the plea agreement's terms, and because the purported newly-discovered evidence did not establish exceptional circumstances. *Gleason*, 2010 WL 3853191 at *3. This rule - that evidence is not newly-discovered if it could have been discovered earlier with due diligence - is a firmly-established rule and a regularly followed practice in Kansas. See *In re Adoption of A.A.T.*, 287 Kan. 590, 629 (2008), *cert. denied* ____ U.S. ____, 129 S.Ct. 2013 (2009). Similarly, the exceptional circumstances rule is also a firmly established and regularly followed state practice. *See e.g.* K.S.A. 60-1507(c); Kansas Supreme Court Rule 183(d); *Holt,* 290 Kan. at 496-97. Accordingly, this court cannot review the merits of this claim.

### 2. Merits

Even assuming no procedural bar, however, the Court finds no basis for granting a habeas petition. In *Brady v. Maryland,* the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87 (1963). "To establish a *Brady* violation, the defendant must prove that the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material." *United States v. Erickson,* 561 F.3d 1150, 1163 (10th Cir. 2009). *See Snow v. Sirmons,* 474 F.3d 693, 711 (10th Cir. 2007) (applying same standard in habeas action under § 2254).

Where the suppressed evidence "insignificantly impact[s] the degree of impeachment," such evidence ordinarily is not "sufficient to meet the … materiality standard." *Douglas v. Workman,* 560 F.3d 1156, 1174 (10th Cir. 2009). Thus, where a witness's credibility "has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim." *Nuckols v. Gibson,* 233 F.3d 1261, 1267 n.8 (10th Cir. 2000) (internal citation and punctuation omitted).

The terms of Cady's plea agreement are allegedly relevant only to bias or credibility. But Cady's bias or credibility were challenged in other ways during trial, since Cady was thoroughly cross-examined at trial and the district court instructed the jury to consider his testimony with caution. Petitioner concedes that Cady testified that he had a plea agreement with the State. Petitioner has failed to show that the precise terms of Cady's plea agreement could somehow have "put the whole case in such a different light as to undermine confidence in the verdict," as is the standard of materiality

24

for *Brady* claims such as those presented here. *See Banks v. Dretke,* 540 U.S. 668, 698 (2004) (quoting *Kyles v. Whitley,* 514 U.S. 419, 435 (1995)). Petitioner has not shown a "reasonable probability of a different result," *Kyles,* 514 U.S. at 434, or that the terms of the plea agreement "would have significantly enhance[ed] the quality of the impeachment evidence." *Douglas,* 560 F.3d at 1174. Accordingly, even the merits of this claim provide no basis for habeas relief.

### Bennett's Plea Agreement and Alleged Recantation

Petitioner contended that Bennett recanted her testimony and that her recantation was an exceptional circumstance that required an evidentiary hearing on his 60-1507 motion and his 60-260(b) motion for relief. The Court of Appeals found that Petitioner had not shown that he could not have discovered Bennett's alleged recantation before filing his third 60-1507 motion. Further, it held that because Bennett did not testify, no evidentiary hearing was necessary and that her plea bargain was irrelevant to the case, and was not so material that the district court would have likely denied the state's motion to dismiss his third 60-1507.

The Kansas Court of Appeals erroneously found that co-defendant Bennett did not testify at trial. *Gleason*, 239 P3d 114, *2. The trial transcript includes the testimony of Bennett, although it omits her name from its index of witnesses who testified. *See* Trans. Vol. I, p. 2, 195–237. Bennett's testimony was substantially incriminatory to Petitioner. She testified that

25

there was a plan to burglarize the victim's house one week before the event;

that Petitioner was the ringleader of the three involved; that her role was to

be the driver and the decoy to get the victim out of his house; that when

Petitioner reappeared after the event he said that Cady had shot the victim;

that Petitioner was upset that Cady had left evidence behind; and that

Petitioner told her if she breathed a word of anything that happened that

night he would personally kill her.

Her testimony additionally established, however, that she was

"currently charged" with one count of conspiracy to commit aggravated

robbery (p. 196), and that part of her plea negotiation for her testimony was

that she would not be charged with murder and would instead just be

charged with the one conspiracy count (p. 220). The jury was thus informed

of the primary essence of her plea agreement, precluding any prejudice to

Petitioner. Further, Petitioner has not proffered any evidence that would

support his assertion that Bennett recanted her testimony, and has not

shown that he could not have discovered any recantation before filing his

third 60-1507 motion. No basis for habeas relief has been shown.

### H. State's Withholding of Evidence from Inquisition

Petitioner contends that officials suppressed telephone records

obtained during KBI inquisitions, some of which would have been material

impeachment evidence. Petitioner framed this issue to the state court as a

*Brady* violation. The Court of Appeals found no *Brady* violation because

Petitioner had received the records from the County Attorney prior to trial, and the records were incriminatory and not exculpatory. *Gleason*, 2007 WL 2301919 at *5-6. Petitioner has not shown the unreasonableness of that decision.

Petitioner may also contend that officials suppressed police reports, but the Court of Appeals refused to address that argument because it was raised for the first time on appeal. *Id.* at *6. That finding constitutes an independent and adequate state procedural ground that bars this Court from considering that claim. *See State v. Perez*, 292 Kan. 785, 789 (2012) (stating general rule that an issue cannot be raised for the first time on appeal; and listing exceptions).

## I. Ineffective Assistance of Trial Counsel

Petitioner contends that his trial counsel was ineffective in the following respects: failing to adequately investigate his case; failing to file a suppression motion; failing to conduct adequate voir dire; and failing to properly object to cell phone records, to letters, and to the prosecutor's alibi argument. A claim of ineffective assistance of counsel based on a trial attorney's failure to make a motion or objection must demonstrate not only the absence of a tactical reason for the omission, but also that the motion or objection would have been meritorious. *Upchurch v. Bruce,* 333 F.3d 1158, 1163-64 (10th Cir. 2003). Some of these claims were addressed by the Kansas appellate court, and as to those claims Petitioner must show that

there is no reasonable argument that his trial counsel satisfied *Strickland's* deferential standard. *Harrington v. Richter,* __ U.S.__, __, 131 S.Ct. 770, 788 (2011). *See White v. Medina,* 2012 WL 401518, *2 (10th Cir. 2012).

### 1. Failing to Move to Suppress Evidence

The parties agree that when Petitioner was taken into custody, he was read *Miranda* warnings, invoked his right to remain silent, and refused to sign a written waiver. Petitioner never invoked his right to counsel. The arresting officer left, and after some time Officer Delaney entered and questioned Petitioner for approximately two hours and twenty minutes, obtaining incriminating evidence. The State contends, and Petitioner denies, that Petitioner voluntarily initiated the conversation with Officer Delaney and thereby waived his right to remain silent. Petitioner does not allege that his statements to Officer Delaney were coerced.

### a. Procedural Bar

This issue was presented to the state courts only in the context of Petitioner's claim that his counsel was ineffective for not having moved to suppress his statements due to the alleged *Miranda* violation. The district court found that this issue should have been raised in Petitioner's direct appeal with his other allegations of ineffective assistance of trial counsel. The Kansas Court of Appeals affirmed that decision, reasoning that a K.S.A. 60-1507 motion cannot be used as a substitute for either a direct appeal or a second appeal, see *Bruner,* 277 Kan. at 607, and that Petitioner failed to

establish exceptional circumstances which would have excused his failure to raise this claim on direct appeal. *Gleason*, 163 P.3d at *4. This is an adequate and independent state ground, which bars reconsideration by this Court.

### b. Merits

The Kansas Court of Appeals additionally ruled on the merits of this issue in considering Petitioner's 60-1507 motion, as did the district court. Neither court found counsel's performance deficient, or prejudicial to Petitioner. *Id.,* 163 P.3d at * 5. Petitioner contends that the Court erred in finding that he initiated the conversation with Officer Delaney.

Under federal law, the Government bears the burden to prove by a preponderance of the evidence that Petitioner knowingly and voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). *See Colorado v. Connelly*, 479 U.S. 157, 168–169 (1986). But a waiver need not be made formally or in writing, and can be implied from the circumstances. *Berghuis v. Thompkins*, __ U.S. __, 130 S.Ct. 2250, 2262 (2010).

> Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.
> ...
> As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.

*Id.*

The record shows that when Petitioner raised this issue in conjunction with a 60-1507 motion, the district court held an evidentiary hearing. Petitioner's counsel testified that he had reviewed the three videotapes[1] of Petitioner's interview prior to trial in 2002, and had decided that there was no basis for a *Miranda* challenge because the agents had read Petitioner his rights at the very beginning, and Petitioner "initially indicated he did not wish to speak with them and then basically initiated conversation with them for ... hours ... At no time did he say he wanted counsel." Trans. Vol. IV, Aug. 11, 2005 hearing, p. 5. Contrary to Petitioner's assertion, police are not required to rewarn suspects from time to time. *Berghuis*, 130 S.Ct. at 2263.

Petitioner's counsel reviewed the tapes of Petitioner's interview again, just prior to the August, 2005 hearing in which he was questioned about not filing a suppression motion:

> Q. You did not file any motion to suppress, is that correct, as far as any statements that may have been made?
>
> A. Correct.
>
> Q. And in hindsight and upon reviewing the tapes again here very recently would your tactics have changed any if you had to do it all again?
>
> A. No.
>
> Q. So it was a tactical decision on your part to go ahead and allow the testimony?
>
> A. After reviewing the tape, yes.

---

[1] Those tapes are not included in the record before this Court.

*Id.*, p. 8. The court reasonably determined that counsel's decision not to file a motion to suppress was a strategic decision and was a reasonable exercise of professional judgment. See *Strickland,* 466 U.S. at 690–91.

Petitioner asserts that the State did not prove the voluntariness of Petitioner's waiver. But Petitioner's counsel testified to that matter in stating:

> Q. In reviewing the videotape … was Mr. Gleason ever given the opportunity by Agent Delaney to cease the interview?
>
> A. Yes, I think on a number of occasions. It was basically, look, if you don't want to talk to me we won't talk, if you want to stop let's stop kind of thing.
>
> Q. Did Mr. Gleason ever stop or say he wanted to stop?
>
> A. No, not till he booked him in.
>
> Q. And in fact isn't there a portion of the interview  late in the interview with Detective Carreno where Gleason points out that, hey, I was trying to talk to those K.B.I. agents earlier, and indicating that he wanted to talk throughout this whole process?
>
> A. Yes.

*Id.*, p. 12. The record supports the finding that the State met its burden to prove the voluntariness of Petitioner's waiver.

Additionally, the district court took possession of the tapes of Petitioner's interview, *Id.*, p. 16, and reviewed them before determining that Petitioner knowingly and voluntarily waived his *Miranda* rights. Based on the

facts of record, the district court's factual determination that Petitioner waived his right to remain silent is reasonable.[2]

The standard applied by the Kansas Court of Appeals is consistent with the well-established federal law established in *Strickland v. Washington,* 466 U.S. 668 (1984). *Strickland* requires the defendant to show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. The record shows not only that Petitioner validly waived his right to remain silent, but also that the incriminating facts admitted at trial via his confession were independently admitted through other witnesses. Petitioner has failed to show that there is no reasonable argument that his trial counsel satisfied *Strickland's* deferential standard.

### 2. Inadequate Voir Dire

Petitioner's allegation that trial counsel failed to conduct an adequate voir dire is procedurally barred because it was never raised to an appellate court. *See Coleman*, 501 U.S. at 732, 735 (issues not raised to the highest court are procedurally barred).

### 3. Inadequate Investigation

The Kansas Supreme Court considered this claim to be whether Petitioner's counsel failed to subpoena certain witnesses to testify at trial, and thus inadequately prepared for trial. This Court shall do the same, since

---

[2] Petitioner's reliance on *Goodwin v. Johnson*, 132 F.3d 162, 178-79 (1998) is misplaced because in that case, unlike here, defendant invoked his right to counsel.

Petitioner's briefs do not specify any other non-conclusory claims of error on this issue.

The Kansas Supreme Court noted that counsel subpoenaed some witnesses who did not testify at trial. One was released and the others were doctors who contested their subpoenas. Part of Petitioner's defense was that he was not physically able to have committed the crimes charged because he was still recuperating from a serious accident. The Court found that counsel had admitted all of the relevant medical records through the doctors and physical therapists who had complied with their subpoenas. 277 Kan. at 675-46. The Court then found that such evidence showed effectiveness of Petitioner's counsel. 277 Kan. at 646.

Petitioner has not shown other facts to support a finding that his counsel was ineffective in his investigation, and has not shown that the Kansas Supreme Court's conclusion was unreasonable. Petitioner has failed to show that there is no reasonable argument that his trial counsel satisfied *Strickland's* deferential standard in the manner in which he handled the subpoenas or witnesses. Therefore, Petitioner is not entitled to federal habeas relief on this ground.

### 4. Failure to Object

Petitioner next claims that his trial counsel was ineffective in failing to properly object at trial to the following matters: his cell phone records;

letters Petitioner had written to his daughter; and to the prosecutor's alibi argument.

The Kansas Supreme Court found that Petitioner's allegation that his counsel was ineffective for failing to object to the introduction of his cell phone records had never been raised to the trial court, so was not properly before the Supreme Court. 277 Kan. at 647. That rule is a firmly established and regularly followed state practice, which is applied to similar claims in an evenhanded manner in the majority of cases. *See e.g. State v. Fulton*, 292 Kan. 642, 652 (2011). Thus, this claim cannot be reviewed.

The Supreme Court also addressed Petitioner's claim that his counsel was ineffective for failing to object to his letters threatening his daughter, which were admitted during the trial. It found that because Petitioner had originally been charged with criminal threat (a charge which was dropped after the State's case-in-chief), the letters were relevant and would have been admissible even had counsel objected. *Gleason*, 277 Kan. at 647-48. That finding is reasonable and effectively negates any possibility of the requisite prejudice.

The Supreme Court also addressed Petitioner's claim that his counsel was ineffective for failing to object to the prosecution's statement during closing argument that implied Petitioner's alibi had been manufactured at the last minute. The Supreme Court noted that Petitioner failed to specify what statements by the prosecutor he found objectionable, as required by

*Strickland*. The court then independently reviewed the prosecutor's closing arguments, and could not find any such implication. 277 Kan. at 647-48.

This Court has done the same. *See* Trans. Aug. 2, 2002, p. 477-489; 504-05. The sole references to alibi follow:

> Now, back at Johnny's, why did the defendant want to see Stephen Pearson? Because it puts him back at Johnny's. Now he's there from about 1930 to midnight. He's got those two times, all he's got to do is fill the gap, he's got an alibi.

*Id.*, p. 484-85.

> Kevin Horch ... He could only put [defendant] there at 7:30 P.M. at night and 2:00 o'clock in the morning, and in fact, says defendant helped him put away things, lifting chairs.

*Id.*, p. 488. Read in the light most favorable to the Petitioner, the transcript includes no implication by the prosecutor that Petitioner's alibi was manufactured at the last minute. The Kansas Supreme Court's decision on this issue was most reasonable. Petitioner has failed to show that there is no reasonable argument that his trial counsel satisfied *Strickland's* deferential standard.

### J. Ineffective Assistance of Appellate Counsel

Petitioner also contends that his appellate counsel failed to raise all proper and adequate issues from trial, direct appeal and post-conviction proceedings. Dk. 1, p. 15.

Petitioner's challenge to the effectiveness of counsel for his post-conviction proceedings fails to state a basis for habeas relief because there is no constitutional right to an attorney in state post-conviction proceedings.

*Coleman*, 501 U.S. at 752 (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987)); 28 U.S.C. § 2254(i).

To the extent Petitioner is challenging his counsel on direct appeal, his challenge makes only conclusory allegations insufficient to meet the *Strickland* standard. *See White*, 2012 WL 401518 at *2.

### K. Issues in Traverse, But Not in Petition

Petitioner's traverse raises the following claims not made in his petition: 1) his trial counsel was ineffective because he had a conflict of interest during trial; 2) the trial court created a conflict of interest at sentencing; and 3) cumulative error. These are new claims are not properly before the court. *See, e .g., Vanderlinden v. Koerner*, 2006 WL 1713929 (D.Kan. 2006), citing *Loggins v. Hannigan*, 45 Fed. Appx 846, 849, 2002 WL 1980469 (10th Cir. 2002) ("We will not consider petitioner's argument ... as this issue was first raised in petitioner's traverse to respondents' answer to habeas petition.") A traverse is not the proper pleading to raise additional grounds for relief.

Nonetheless, even if the claims were not procedurally barred, they would be denied on the merits for the following reasons.

### 1. Conflict of Interest Claims

Petitioner contends in his traverse that his trial counsel was ineffective because he had a conflict of interest – his counsel was prosecuting defendants for the State of Kansas at the same time he was actively

representing Petitioner. Dk. 24, p. 28. The record confirms that Petitioner's counsel served as an Assistant County Attorney in a neighboring county for the first two months that he defended the Petitioner, prior to trial.

Petitioner raised this issue on direct appeal, and the Kansas Supreme Court held that there was no actual conflict of interest because Petitioner failed to show that his counsel's position actually affected the adequacy of his representation. *Gleason*, 277 Kan. at 651-52 (citing *Cuyler v. Sullivan,* 446 U.S. 335 (1980)). That counsel had served as an assistant prosecutor during the first two months of his pretrial representation of Petitioner was insufficient to show the required conflict of interest. *Id.*

Under clearly-established federal law, which the Kansas Supreme Court applied, a theoretical division of loyalties is insufficient. Instead, Petitioner has the burden to show that the relationship resulted in a division of loyalties which adversely affected trial counsel's performance. *See Mickens v. Taylor,* 535 U.S. 162, 172 n. 5 (2002) (finding "[a]n 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance."); *Cuyler,* 446 U.S. at 348–49; *Redden v. Calbone*, 223 Fed.Appx. 825, *4 (10th Cir. 2007) (concluding "the record gives us no basis for concluding that there is a reasonable probability that, but for the trial counsel's [father-daughter] relationship with the district attorney, Redden would have been acquitted.")

To meet this burden, Petitioner points to four events: 1) counsel failed to seek a mistrial when the State violated the motion in limine, and instead only moved to strike; 2) counsel did not actively pursue discovery of codefendants' plea agreements for use as impeachment evidence; 3) counsel failed to file a motion to suppress regarding the *Miranda* violation; and 4) counsel failed to object to the partial confession elicited from the *Miranda* violation and failed to seek a *Jackson v. Denno* hearing.

The latter three events relate to issues this Court has previously addressed in this order. The first contends that his counsel should have moved for a mistrial when the Prosecutor violated the motion in limine prohibiting evidence of Petitioner's prior crimes. But Petitioner cannot show that if his counsel had done so, the motion for mistrial would have been granted. Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. *State v. Rinck,* 256 Kan. 848, 853 (1995). Kansas courts may declare a mistrial *sua sponte,* without a motion from either party. *See* K.S.A. 22-3423; *State v. Wimbley,* 271 Kan. 843, 851 (2001). That the trial court did not declare a mistrial *sua sponte* and instead struck the prohibited testimony about Petitioner's prior crimes and gave a curing instruction reveals its belief that the incident was not incurably prejudicial. That decision has not been shown to be an abuse of discretion or unreasonable, thus Petitioner has not shown this issue to be meritorious.

Petitioner additionally contends that the trial court created a conflict of interest by appointing counsel (Ireland) to argue that trial counsel (Kurth) was ineffective, but allowing trial counsel to represent Petitioner at his sentencing, immediately after the court determined that trial counsel would not be removed. Petitioner believes that trial counsel was unprepared for sentencing because he had asked to withdraw from the case, failed to file a motion for durational departure, and relied during sentencing only on the motion for durational departure filed by Petitioner.[3]

On direct appeal, the Kansas Supreme Court found that Petitioner could not show his counsel's performance had been adversely affected, 277 Kan. at 654. Specifically, "he cannot show Kurth's performance at sentencing was adversely affected when Kurth's oral arguments were entirely based upon Gleason's own motion for durational departure." *Id*. Petitioner has failed to show that there is no reasonable argument that his trial counsel satisfied *Strickland's* deferential standard in this respect.

### 2. Cumulative Error

Lastly, Petitioner's traverse alleges cumulative error based on the totality of the circumstances which substantially prejudiced him and denied him a fair trial. Dk. 24, p. 32. Cumulative-error analysis applies only where the record reveals two or more actual errors, and petitioner is entitled to

---

[3] Petitioner also asserts that the court ruled on the ineffective assistance of counsel claim pursuant to K.S.A. § 60-1507 while the sentence was pending, causing the conflict of interest. The record fails to support this assertion.

relief only if the entire trial was so fundamentally unfair as to constitute a violation of his due process rights. *Hoxsie v. Kerby,* 108 F.3d 1239, 1245 (10th Cir. 1997). Petitioner has not established any constitutional errors in his conviction or sentence. Accordingly, the Court denies this claim for relief.

## V. Evidentiary Hearing

The court finds no need for an evidentiary hearing. "[A]n evidentiary hearing is unnecessary if the claim can be resolved on the record." *Anderson v. Attorney Gen. of Kansas,* 425 F.3d 853, 859 (10th Cir. 2005); *see Schriro v. Landrigan,* 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). The record in this case refutes Petitioner's allegations and otherwise precludes habeas relief.

## VI. Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Proceedings states that the court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. "A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has rejected the constitutional claims on the merits, a petitioner makes that showing by demonstrating that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). *See United States v. Bedford,* 628 F.3d

1232 (10th Cir. 2010). Petitioner has not met this standard as to any issue presented, so no certificate of appealability shall be granted.

## VII. Motion to Substitute Party

Respondents have moved to substitute Derek Schmidt, the current Attorney General for the State of Kansas, for Stephen Six, the former Attorney General for the State of Kansas. Dk. 16, p.1, n.1. This motion is granted.

IT IS THEREFORE ORDERED that the petition for habeas corpus relief under 28 U.S.C. § 2254 is denied.

IT IS FURTHER ORDERED that the motion to substitute party is granted.

Dated this 19th day of July, 2012 at Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge